IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2024 Term

_____

No. 22-0407

_____

FILED

June 6, 2024

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

BLACKROCK ENTERPRISES, LLC,
Defendant Below, Petitioner,

v.

BB LAND, LLC, and JB EXPLORATION 1, LLC,
Plaintiffs Below, Respondents.

_____

Appeal from the Circuit Court of Pleasants County, West Virginia
Business Court Division
The Honorable Michael D. Lorensen, Judge
Civil Action No. CC-37-2018-C-2

REVERSED AND REMANDED, IN PART;
VACATED, IN PART

_____

Submitted:  May 1, 2024
Filed:  June 6, 2024

Brian R. Swiger, Esq.                         Charles R. Bailey, Esq.
Brian A. Glasser, Esq.                        Josef A. Horter, Esq.
Christopher D. Smith, Esq.                    Bailey & Wyant PLLC
John A. Budig, Esq.                           Charleston, West Virginia
Bailey & Glasser LLP                          and
Charleston, West Virginia                     Geoffrey Bracken, Esq.
Counsel for Petitioner                        Vi Tran, Esq.
                                              Foley & Lardner LLP
                                              Houston, Texas
                                              *Pro Hac Vice*
                                              Counsel for Respondents

JUSTICE WOOTON delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.    "The appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998] is *de novo*."  Syl. Pt. 1, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009).

2.    "When this Court reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial under Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998], it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented.  Instead, its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below.  Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party."  Syl. Pt. 2, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009).

3.    The determination of whether a material issue raised by the pleadings or evidence has been unfairly omitted from a special verdict rendered pursuant to West Virginia Rule of Civil Procedure 49(a) is reviewed de novo.  Where a trial court makes findings on such omitted issues, or findings are deemed to have been made consistent with its judgment on the special verdict, those findings will be reviewed for clear error.

i

4. The general rule that a breaching party's uncured, material failure of performance discharges the other party's duty to perform does not apply when the non-breaching party, with knowledge of the facts, either performs or indicates a willingness to do so despite the breach or insists that the breaching party continue to render future performance.

5. To determine whether a material issue has been unfairly omitted from special findings requested under West Virginia Rule of Civil Procedure 49(a), the court must consider whether 1) when read as a whole and in conjunction with the general charge and instructions, the questions submitted adequately presented the contested issues to the jury; 2) the submission of the issues to the jury was fair; and 3) the ultimate questions of fact were clearly submitted to the jury.

WOOTON, Justice:

This is an appeal from the April 25, 2022, order of the Circuit Court of Pleasants County, Business Court Division, granting judgment in favor of respondents/plaintiffs below BB Land, LLC and JB Exploration 1, LLC (hereinafter collectively "Jay-Bee")[1] and awarding them legal and equitable relief against petitioner/defendant below Blackrock Enterprises, LLC (hereinafter "Blackrock"). In the proceedings below, Jay-Bee and Blackrock asserted breach of contract claims against one another pursuant to a Lease Acquisition Agreement ("LAA") and sought declaratory relief regarding their respective rights and obligations. The trial proceedings were bifurcated; in the liability phase a jury found that both Blackrock and Jay-Bee committed material breaches of the LAA, but that Blackrock committed the first material breach. As a result, the business court concluded Blackrock could not recover for any subsequent breach committed by Jay-Bee. In the second phase of the proceedings, the business court determined that the parties were engaged in a de facto mining partnership and ordered Blackrock dissociated from the partnership pursuant to the West Virginia Revised Uniform Partnership Act ("RUPA"), West Virginia Code §§ 47B-11-1 to -5 (1996). As part of the damages assessment for Blackrock's breach and the required partnership valuation under RUPA, the business court valued Blackrock's partnership interest at zero upon application

---

[1] We adopt the parties' collective designation of the respondent companies for ease of reference.

1

of an industry-standard "risk premium/penalty" and ordered it to quit-claim its interests in certain leases to Jay-Bee.

Blackrock appeals, arguing that the business court committed multiple errors in both phases of the proceedings, including its handling and construction of the jury's special verdict findings, its determination that the parties were engaged in a common law mining partnership, and its rulings as to damages and partnership valuation.

After careful review of the briefs of the parties, their oral arguments, the appendix record and the applicable law, we find that the business court erred in its construction of the first material breach doctrine and by granting judgment for Jay-Bee on the basis of clearly erroneous findings "deemed" made by operation of West Virginia Rule of Civil Procedure 49(a). Accordingly, we reverse the final judgment entered below and remand for a new trial and further proceedings. We further vacate that portion of the final judgment order finding the parties engaged in a mining partnership, as more fully explained herein.

## I.    FACTS AND PROCEDURAL HISTORY

### A.  *FACTUAL BACKGROUND*

Although the evidence elicited at trial regarding the parties' relationship was extensive, we focus our discussion on those facts pertinent to and necessary for context as

2

to the dispositive issues. On May 18, 2013, Blackrock and Jay-Bee executed the LAA under which Blackrock agreed to acquire mineral leases in an "area of mutual interest" (the "AMI") in Pleasants County, West Virginia, and assign them to Jay-Bee for the purpose of drilling horizontal Marcellus and Utica wells. Under the LAA, Blackrock was required to perform abstracting work related to the leases, obtain title insurance, provide lease packets (containing executed leases from the mineral owners among other information), and maintain updated maps reflecting its leasing efforts. Incentivizing the agreement was Blackrock's already-completed base of title abstracts in the AMI which it obtained through its work with a local abstracting company. In exchange for these lease acquisition services, Blackrock retained an "earned interest" in the assigned leases. Jay-Bee had a reciprocal obligation to offer Blackrock an interest in any leases it obtained within the AMI.

In addition to its earned interest, Blackrock also had the option to purchase up to twenty-five percent additional interest in all leases acquired under the LAA. To exercise this option, the LAA required Blackrock to either tender payment for the additional interests or notify Jay-Bee in writing if it "desires not to exercise its rights to acquire the Additional Percentage" within forty-five days (later extended to sixty days) of receipt of an invoice. However, the LAA placed no obligation on Blackrock to purchase additional interest in the leases, expressly providing: "Blackrock is not required to make said purchase; it is solely Blackrock's decision." The LAA further stated that Jay-Bee would have "full control" of Blackrock's interests in the subject leases and that the parties agreed to later execute any additional documentation necessary.

3

It appears undisputed that shortly after the LAA was executed the parties' working relationship began to deteriorate, each party maintaining that the other was not complying with its obligations under the LAA. The difficulties between the parties were reflected in extensive correspondence admitted at trial between their respective principals—Randy Broda, managing member of BB Land, LLC, and Michael Benedum, managing member of Blackrock—as well as the companies' other officers and agents. Jay-Bee argued at trial that Blackrock's material breach of the LAA was "early, often and continuing[,]" and included its acquisition of leases which it did not offer to Jay-Bee, failure to timely provide maps, and failure to participate in or adhere to procedures outlined in the LAA regarding the purchase of additional interests in the AMI leases.

With regard to the latter, Blackrock purchased additional interest in only one group of leases in late 2013; otherwise, it neither availed itself of the option to purchase additional interests nor provided notice that it declined to purchase them.[2] In that regard, and of significance to the issues raised on appeal, evidence at trial reflected that on December 9, 2013, Jay-Bee tendered an invoice for $738,055.78 to Blackrock representing additional interest in a highly beneficial lease arrangement associated with the "Benefiel" property. Blackrock's option to purchase additional interest in the Benefiel lease expired

---

[2] Evidence at trial indicated Blackrock attempted to purchase additional interests in November 2014, but Jay-Bee deemed the tender untimely—which Blackrock disputed.

on February 4, 2014, and it failed to tender payment or provide notice that it did not intend to purchase the additional interest by that date.

In early 2014, the parties' relationship continued to deteriorate and resulted in what was referred to as a "Mexican stand-off" by a Jay-Bee officer. Communications from early 2014 reflect Jay-Bee's refusal to pay rentals on leases recently acquired by Blackrock or offer additional interest in leases it acquired, citing Mr. Benedum's refusal to timely communicate with Mr. Broda. Blackrock maintained that these actions by Jay-Bee were an attempt to force Blackrock to execute a new "service agreement" featuring a thirty-day termination provision that would more easily allow Jay-Bee to terminate the relationship.

Jay-Bee contends that as a result of these difficulties it decided to terminate the LAA. On February 8, 2015, Mr. Broda wrote to Mr. Benedum stating that the LAA was "not working" and outlining Blackrock's failure to purchase additional interests in the leases and provide weekly maps which were critical to track leasing efforts.[3] The letter stated that Jay-Bee "will not continue this going forward without a new agreement" and that if Blackrock did not respond by the end of February, Jay-Bee "will assume that you agree the agreement is null and void." On February 25, 2015, Mr. Benedum responded,

---

[3] Jay-Bee contended at trial that the failure to provide weekly maps caused duplication of effort in the field; significant focus was drawn to Jay-Bee's use of other companies to purchase lease interests, resulting in bidding wars between the companies for lease acquisition.

complaining generally that Jay-Bee had also failed to adhere to the terms of the LAA—without providing specifics—but indicating that Blackrock would continue to acquire and offer leases in compliance with the LAA. The letter cautioned that Jay-Bee "d[id] not have a right to terminate th[e] agreement unilaterally" and that Blackrock "do[es] not agree to a termination of this agreement[.]"

The parties dispute the extent and characterization of their continued dealings following this February 2015 attempted termination. Blackrock offered evidence that it argued was indicative of the parties' continued performance under the LAA, including 1) Jay-Bee's acceptance of a small number of additional lease assignments in 2015; 2) an October 2015 email from Mr. Broda to Mr. Benedum stating that he agreed with Blackrock's attorney "that the agreement is in effect"; and 3) Jay-Bee's acceptance of nineteen leases in July 2016, for which it credited Blackrock with its earned interest as outlined in the LAA. Jay-Bee disputed the significance of these events at trial, arguing that after February 2015, the parties were not "operating like we previously had under the [LAA]" but rather were merely "picking and choosing" leases to accept from Blackrock.

To rebut Blackrock's evidence of continuing performance under the LAA, Jay-Bee introduced evidence which it characterized as reflecting the formation of a "new deal" whereby the parties intended to move forward jointly in the drilling and development of the mineral interests. In February 2017, the parties began negotiating a Joint Operating Agreement ("JOA") for that purpose; although they exchanged drafts of a JOA, no

6

agreement as to its terms was reached. In April 2017, as the JOA negotiations reached a stalemate, Blackrock withdrew its consent for Jay-Bee to drill under the subject leases. However, in an attempt to "resolve [] differences" and "regain the spirit of the agreement," on May 6, 2017, Jay-Bee offered Blackrock a renewed opportunity to purchase additional interests in certain leases "pursuant to the AMI agreement"[4] including those which it had previously "refused[.]"

On August 22, 2017, Jay-Bee sent Blackrock another invoice for additional interest in certain leases it acquired between March and August 2017 "per the terms of the AMI Agreement."[5] On September 28, 2017, Blackrock indicated its agreement to purchase those interests and on November 10, 2017, tendered a check for $1.4 million for the additional interests, which was refused by Jay-Bee. At trial, Blackrock argued that this constituted Jay-Bee's material breach of the LAA.

---

[4] Testimony at trial indicated that references to the "AMI Agreement" were intended to refer to the LAA.

[5] Blackrock claims—and Jay-Bee does not appear to dispute—that it assigned Jay-Bee 163 leases in total after Blackrock's "first breach" of February 4, 2014, the date Blackrock's notice of declination to participate in the Benefiel leases was due. The business court's order, however, focuses on assignments made after the February 8, 2015 attempted termination, stating that "neither party made any further lease offerings in accordance with the terms of the LAA[]" and that "Blackrock only assigned a total of two tracts to Jay-Bee" after that date. The record does not clearly reflect, and the parties do not address, whether these findings, as stated, are at odds with the evidence.

7

On December 11, 2017, Jay-Bee sent another letter to Blackrock with the subject line "Termination of May 18, 2013 Agreement."[6] The letter referred to the LAA as "only a part of this venture" and recounted Blackrock's representation that it desired and had the funding to participate in "leasing and drilling," but noted that Blackrock had failed to provide its share of the associated costs, which at that point totaled $52 million.[7] The letter stated that as of July 2016, Blackrock had stopped assigning leases and had not purchased additional interests since late 2013. The letter further recapped Jay-Bee's complaints about Blackrock's failure to supply "essential information" needed for the venture, including weekly maps, and its lack of communication generally; it outlined the parties' attempts to reconcile these issues and the various negotiations that ensued. The letter concluded by stating: "You are hereby notified that the Lease Exchange Agreement is terminated." While arguing that the February 2015 letter was inadequate to terminate the LAA, Blackrock agreed at trial that this letter terminated the parties' contractual relationship.

## B. TRIAL AND POST-TRIAL PROCEEDINGS

On January 11, 2018, Jay-Bee filed the underlying complaint asserting a variety of causes of action against Blackrock and Mr. Benedum, including breach of

---

[6] As previously noted, the effective date of the LAA was May 18, 2013.

[7] It appears undisputed that at no time did Blackrock contribute to any drilling or development costs; its contention at trial was that the LAA required no such funding and that no JOA had yet been mutually agreed upon.

contract and fraudulent inducement;[8] the complaint also sought declaratory relief as to the parties' rights and obligations under the LAA. Blackrock counterclaimed for, inter alia, breach of contract for failure to provide payment for or interest in certain leases, and likewise sought declaratory relief.[9]

Following a period of discovery the parties convened for a jury trial. After the jury was empaneled the parties agreed to try the case in two phases, bifurcating "liability" from the residual issues of 1) whether the parties were engaged in a common law mining partnership; 2) contractual damages; and 3) relief under RUPA. The parties further agreed that "phase one" liability issues would be tried to a jury and that the "phase two" residual issues would belong to the business court to rule on the existence of a mining partnership and fashion any remedies including any "equit[able] and legal remedies that may be appropriate." [10]

---

[8] Additional causes of action were pled, but the only claims remaining at trial were breach of contract and fraudulent inducement, along with the request for declaratory relief. The business court granted judgment as a matter of law on the fraudulent inducement claim.

[9] Blackrock also brought a third-party action against additional "Jay-Bee"-related companies and their principals, Randy Broda and Debbie Broda Morgan. The parties appear to have been reduced to only the original named parties by the time of trial.

[10] Specifically, the parties agreed that the claims of fraudulent inducement and breach of contract would be tried to the jury in phase one and, in phase two, "the [c]ourt would then determine the issue of whether a mining partnership exists and damages, potentially to include specific performance, based on the jury's determination[s]." Notably, our review of the record indicates the parties did not formally suggest or agree to bifurcation until the first day of trial—just before the jury was empaneled.

The "phase one" jury trial on liability began on March 2, 2021, lasting ten days.[11] Jay-Bee's contention at trial was that Blackrock never had the intention to fully participate in the venture, never had the funding to do so, and was surreptitiously "shopping its interests" to competitors of Jay-Bee. Jay-Bee argued that Blackrock's refusal to sign a JOA was an effort to stonewall its necessary contribution to development costs, awaiting discovery of hydrocarbons that would increase the buyout value of its interests. With regard to Blackrock's material breach of the LAA, Jay-Bee specifically argued that Blackrock failed to provide weekly maps and refused to purchase additional interest or provide notice of its declination to purchase additional interest in the AMI leases. Jay-Bee further claimed that Blackrock materially breached the LAA by acquiring—both by Mr. Benedum personally and through use of a "strawman" company—certain leases that fell within the ambit of the AMI but were not offered to Jay-Bee as required by the LAA. Jay-Bee argued that the earliest of those acquisitions, involving the "Bunner tract" in 2012, was

---

[11] After the jury was discharged on one day of trial, the business court heard evidence from Mr. Benedum specific to the mining partnership issue. Mr. Benedum briefly testified that Blackrock was not involved in any planning or operational decisions relative to actual drilling. However, he conceded that to the extent he had a working interest in the leases, he would share profits and losses with regard to the "sale and the marketing of hydrocarbons[.]"

The business court and the parties contemplated that additional evidence affecting the mining partnership issue might be adduced during the jury proceedings and that "[t]he [c]ourt will keep track of the facts having to do with mining partnership[.]" Jay-Bee's counsel elaborated that "with regard to damages . . . we're going to leave that to the [c]ourt incident to the [c]ourt *taking the jury's factual findings*, applying the law to those factual findings, and doing whatever the [c]ourt decides is proper under RUPA, mining partnership, or any other law that the Court wishes to bring in." (Emphasis added). *See* text *infra*.

10

Blackrock's first material breach.[12]  Jay-Bee contended that its February 2015 letter was effective to terminate the LAA.

Blackrock countered these arguments at trial by contending that any ostensible lack of compliance with the LAA was immaterial, and that Jay-Bee was entering similar lease acquisition agreements with other companies such as to "cut it out" of participation in the leases in the AMI by way of its earned interest.  Blackrock disputed the materiality of its alleged breaches by 1) underscoring the LAA's provision that made purchase of additional interests entirely optional for Blackrock; 2) highlighting an email from Jay-Bee Oil and Gas's Vice President of Land Brian Paugh stating that Mr. Broda "does not want to send reminders [about payment for additional interests] to [Blackrock] because in all honesty, we really don't want them involved in all of the tracts"; and 3) arguing the insignificance of the mapping issues and lease interests not conveyed as compared with the overall scope of the venture.

To further counter Jay-Bee's position that it terminated the LAA in February 2015, Blackrock argued that Jay-Bee's conduct thereafter demonstrated the parties' continued performance under the LAA, including but not limited to Jay-Bee's continued

---

[12] Although this acquisition pre-dated the LAA, Jay-Bee argued that Mr. Benedum conceded he was required to convey this interest to Jay-Bee; Blackrock contended the failure to do so was a mere oversight.  A later acquisition of a lease underlying the "Tawney tract" was also cited as a material breach; Blackrock maintained that it properly conveyed the mineral interests, and that title issues affected its conveyance of the surface estate.

acceptance of lease assignments in 2015 and 2016, crediting Blackrock with earned interest as prescribed by the LAA. Further, Blackrock highlighted written correspondence between the parties and their attorneys in 2017 which referenced offers made "pursuant to" the LAA, as well as the 2015 email from Mr. Broda agreeing that the agreement was still "in effect." Blackrock also argued that the December 2017 letter purporting to terminate the "Agreement of May 18, 2013" itself was evidence that the LAA remained in effect until that time. During closing arguments, Blackrock's counsel drew particular attention to the acceptance of the 2016 lease assignments, arguing that they demonstrated Jay-Bee's "ratification" of the contract or "waiver." Finally, Blackrock argued that it was Jay-Bee that materially breached the LAA by refusing its tender of payment for the August 2017 additional interest offering.

At the close of evidence, the jury was instructed, inter alia, on various elements of breach of contract and certain defenses including waiver, novation, ratification, and reaffirmation.[13] With the apparent consent of the parties, the business court submitted "special interrogatories" to the jury on specific issues pursuant to West Virginia Rule of Civil Procedure 49(a) rather than requesting the return of a general verdict.[14] The

---

[13] *See infra* nn.19 & 20.

[14] Rule 49(a) provides:

> (a) **Special Verdicts.** The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may

(continued . . .)

12

interrogatories consisted of six questions which had apparently been developed by the business court and presented to the parties at the charge conference, as discussed more fully *infra*.[15] The jury returned a special verdict, finding that 1) both Blackrock and Jay-Bee materially breached the LAA; 2) Blackrock committed the first material breach on February 4, 2014—the date Blackrock's notice of declination to participate in the Benefiel leases was due; and 3) Jay-Bee gave reasonable notice of the termination of the LAA on December 11, 2017, rather than in February 2015.

> submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

Effective January 1, 2025, Rule 49 will be amended stylistically to comport with the language of Federal Rule of Civil Procedure 49; however, the functional operation of Rule 49(a) remains the same.

[15] During oral argument, counsel for Blackrock indicated that Jay-Bee submitted a proposed verdict form pre-trial. We note that the verdict form submitted by Jay-Bee bears little to no resemblance to the form submitted to the jury but does include interrogatories as to whether each party's "failure to comply" with the LAA, if any, was "excused."

After the "phase one" liability trial, Blackrock filed a dual motion under West Virginia Rules of Civil Procedure 49(a) and 50(b). The motion sought judgment as a matter of law on the basis that its "first breach"—as identified by the jury—lacked materiality. Blackrock argued that the failure to provide notice of declination to purchase additional interests in the Benefiel tract leases on February 4, 2014 was not an "essential purpose" of the LAA because it had no obligation to purchase additional interests by the LAA's very terms.

Blackrock's motion further sought judgment as a matter of law on the basis that the jury implicitly found its first material breach waived. Blackrock argued that the jury had effectively determined that the LAA had survived Blackrock's February 2014 "first breach" through application of one of the affirmative defenses of waiver, ratification, or reaffirmation—all of which it had been instructed on. Blackrock contended that by finding reasonable notice of termination to have occurred in December 2017, rather than February 2015, the jury necessarily found that the parties' contractual relationship was still "alive" until that time. In the alternative, the motion requested that the business court utilize the discretion granted under Rule 49(a) to make additional findings on the "omitted" issues of breaches occurring after February 2015—since the jury's special verdict established that the parties had a continuing contractual relationship as of that date.

The business court denied Blackrock's motion, finding the jury's determination of materiality to be supported by sufficient evidence and refusing to make

14

any additional "gap-filling" findings regarding subsequent breaches by the parties. The court rejected Blackrock's contention that the jury's verdict necessarily implied that it found that Jay-Bee waived Blackrock's first breach or thereafter ratified or reaffirmed the contract. The court further found that Blackrock failed to demonstrate that it had "proposed to include these concepts on the verdict form." Finally, the court concluded that the jury was not requested to determine whether there were any "subsequent" breaches and that, in any event, any such subsequent breaches are "immaterial under [the] first breach [doctrine]."

"Phase two" of the proceedings commenced thereafter with briefing on the existence of a mining partnership between the parties. On May 13, 2021, the business court entered an order finding that the "process of engaging to jointly develop acreage must be categorized as a mining partnership" and therefore, the parties "rights, remedies, and damages" as to developed lease interests were controlled by RUPA; undeveloped or non-producing leases were to be controlled by partition pursuant to West Virginia Code Chapter 37. On September 22-23, 2021, a bench trial was conducted, and additional evidence presented regarding the legal and equitable remedies available to Jay-Bee as contract damages and/or relief under RUPA.[16]

---

[16] Because the issues as to liability are dispositive, we find it unnecessary to provide greater detail regarding the evidence adduced and analysis performed by the business court in regard to the "phase two" proceedings. *See* text *infra*.

On April 25, 2022, the business court entered its final judgment order granting judgment for Jay-Bee, concluding that "as the first material breacher, Blackrock is not entitled to any monetary damages or affirmative relief from Jay-Bee." Incorporating its prior mining partnership rulings, the court further concluded that under RUPA, Blackrock should be dissociated from the partnership and the buyout value of its partnership interests was zero; the court reached this figure by applying an industry standard "risk premium/penalty" about which it had received testimony, reasoning that Blackrock's failure to participate in the cost and risk of drilling warranted its application. Finally, the court made additional findings regarding Blackrock's breach of the LAA in its acquisition of lease interests which were not offered to Jay-Bee and required Blackrock to quit-claim certain interests to Jay-Bee as specific performance. This appeal followed.

## II.    STANDARD OF REVIEW

Although Blackrock appeals multiple aspects of the business court's final judgment order, our resolution necessitates that we articulate only those standards applicable to our review of the denial of Blackrock's motion for judgment as a matter of law and any subsidiary issues. It is generally established that "[t]he appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998] is *de novo*." Syl. Pt. 1, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16, 17 (2009). Further, "when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party." *Id*. at 1,

16

680 S.E.2d at 17, Syl. Pt. 2, in part. Any subsidiary issue of law is likewise subject to de novo review. Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.").

More specific to our consideration of the business court's construction and handling of the Rule 49(a) special verdict, however, we find no satisfying standard of review. We have previously held that "[g]enerally, this Court will apply an abuse of discretion standard when reviewing a trial court's decision regarding a verdict form." Syl. Pt. 4, *Perrine v. E.I. du Pont de Nemours & Co.*, 225 W. Va. 482, 694 S.E.2d 815 (2010). This standard has typically, but not exclusively, been invoked when there is a challenge to *use* of a special, rather than general, verdict or the submission of special interrogatories in aid of a general verdict under Rule 49(b). *See, e.g.*, *Tri-State Petroleum Corp. v. Coyne*, 240 W. Va. 542, 562, 814 S.E.2d 205, 225 (2018) ("A trial court exercises considerable discretion in determining *whether* to give special interrogatories and verdicts to a jury, unless required to do so by statute." (emphasis added)); Syl. Pt. 8, *Barefoot v. Sundale Nursing Home*, 193 W. Va. 475, 457 S.E.2d 152 (1995) ("As a general rule, a trial court has considerable discretion in determining *whether* to give special verdicts and interrogatories to a jury unless it is mandated to do so by statute." (emphasis added)); *Torrence v. Kusminsky*, 185 W. Va. 734, 745, 408 S.E.2d 684, 695 (1991) ("[W]hether to give special interrogatories to the jury is within the trial court's discretion.").

17

As indicated above, the business court utilized the "special verdict" process outlined in West Virginia Rule of Civil Procedure 49(a) which permits the jury to return findings as to specific facts. The assignments of error in this case do not challenge the business court's *use* of a Rule 49(a) special verdict, but rather its refusal to submit certain issues to the jury, its failure to conduct additional fact-finding on those issues, and ultimately its construction of the special verdict findings. Those aspects of Rule 49(a) have only been obliquely addressed by this Court. In *Teter v. Old Colony Co.*, 190 W. Va. 711, 720, 441 S.E.2d 728, 737 (1994), we addressed the trial court's broad discretion with respect to special verdict forms, requiring only that their use submit the case "fairly." However, that case presented no occasion to further ascertain our standard of review regarding omission of issues or fact-finding under the rule. Because the special verdict issues presented herein more squarely implicate this fact-finding element of Rule 49(a) and its effect on the resulting judgment, a more tailored standard of review is required.

Federal courts reviewing this aspect of special verdicts under its similar Rule 49(a) have established a two-pronged standard of review. "[Q]uestions such as whether a particular fact was omitted, or if omitted, was material to the submitted issue, are legal in nature and call for plenary review." *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 916 (1st Cir. 1988); *accord Gaia Techs. Inc. v. Recycled Prod. Corp.*, 175 F.3d 365, 370 (5th Cir. 1999) ("We review *de novo* whether a district court is authorized to make findings under Rule 49(a)."). However, if findings on omitted issues are either made by the court or "deemed

18

made" by operation of Rule 49(a), federal courts have reviewed the findings themselves under a clearly erroneous standard:

> [O]nce such threshold matters are resolved, a different test is needed. Where, as in this case, a material fact was indeed omitted, the judge must indulge in differential factfinding in an environment dominated by the text of Rule 49. . . . Consequently, there is every reason to treat the district court's Rule 49 findings of fact in the same manner as findings of fact made after a bench trial, reviewable under the "clearly erroneous" standard of Fed. R. Civ. P. 52(a).

*Anderson*, 862 F.2d at 916; *accord J. C. Motor Lines, Inc. v. Trailways Bus Sys., Inc.*, 689 F.2d 599, 602 (5th Cir. 1982) (reviewing Rule 49(a) findings by the court "under the 'clearly erroneous' standard of F.R. Civ. P. 52(a)"); *Therrell v. Ga. Marble Holdings Corp.*, 960 F.2d 1555, 1563 (11th Cir. 1992) (concluding that with regard to omitted issue in Rule 49(a) special verdict "the district court acted as the trier of fact on the fraud issue[] [and] we must determine whether or not the district court's finding was clearly erroneous[]"); *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1535 (Fed. Cir. 1987) (district court's findings on "inadvertent omission" from Rule 49(a) special verdict reviewable under "clearly erroneous" standard of Rule 52).

We agree with this two-pronged approach. Therefore, we hold that the determination of whether a material issue raised by the pleadings or evidence has been unfairly omitted from a special verdict rendered pursuant to West Virginia Rule of Civil Procedure 49(a) is reviewed de novo. Where a trial court makes findings on such omitted issues, or findings are deemed to have been made consistent with its judgment on the

special verdict, those findings will be reviewed for clear error. With these standards in mind, we proceed to the parties' arguments.

## III.  DISCUSSION

Blackrock advances eight assignments of error encompassing the business court's handling of both phases of the proceedings.  We begin with the potentially dispositive assignments of error as to the "phase one" proceedings determining liability. Specifically, Blackrock assigns as error the business court's handling of the special verdict and its conclusion that Jay-Bee was the prevailing party pursuant to the first material breach doctrine, thereby disallowing Blackrock recovery for Jay-Bee's breach.[17]

To understand Blackrock's assignments of error as to liability, the jury's answers to the special verdict interrogatories must be more closely examined.  The questions submitted to the jury, along with its responses, are as follows:

> Do you find by a preponderance of the evidence that *Blackrock* . . . materially breached the [LAA]?        *Yes*.
>
> Do you find by a preponderance of the evidence that [*Jay-Bee*] materially beached the [LAA]?     *Yes*.
>
> Do you find by a preponderance of the evidence that [Jay-Bee] gave reasonable notice of termination of the [LAA]?     *Yes*.

---

[17] Blackrock further assigns as error the business court's refusal to set aside the jury's materiality determination regarding Blackrock's first breach of the LAA.  Given our ultimate resolution of this case, we need not reach this issue.

20

We find by a preponderance of the evidence that [Jay-Bee] gave reasonable notice of the termination of [the LAA] on the following date:     *December 11, 2017*

We find by a preponderance of the evidence that the following party committed the *first material breach* of the [LAA]: *Blackrock*

We find by a preponderance of the evidence that the first material breach of the [LAA] occurred on this date:     *2-4-14*

(emphasis added). [18] In short, the jury found that *both* Blackrock and Jay-Bee breached the LAA but that Blackrock breached first on February 4, 2014—the date either its payment or a declination notice as to the Benefiel tract was due. However, the jury also found that Jay-Bee did not give reasonable notice of termination of the LAA until December 11, 2017—well over three and a half years later, thereby rejecting Jay-Bee's argument that it provided reasonable notice of termination in February 2015. With this understanding of the jury's special verdict, we proceed to the parties' arguments.

A.    *FIRST MATERIAL BREACH DOCTRINE*

Because it informed the business court's analysis of the special verdict issues, we find it expedient to begin with Blackrock's assertion that the court erred in its construction of the first material breach doctrine. In its order denying Blackrock's Rule 49 and 50 motions and in the final judgment order, the court construed the jury's conclusion

---

[18] The verdict form also includes a handwritten notation of "98K" under the jury's response of "2-4-14" that Jay-Bee's counsel suggests is a reference to Exhibit 98K—an email from Mr. Broda regarding the Benefiel lease stating "[t]he check from you is due 2/4/14[.]"

that Blackrock committed the first material breach as dispositive of Blackrock's ability to recover for any breach by Jay-Bee. The court determined that under the first material breach doctrine, once a party has committed the first material breach under a contract, any subsequent breaches by the other party are "immaterial" and non-recoverable: "[A]s the first material breacher, Blackrock is not entitled to any monetary damages or affirmative relief from Jay-Bee." It therefore declared Jay-Bee the "prevailing party" and, after finding the parties engaged in a mining partnership, granted relief solely to Jay-Bee notwithstanding the jury's conclusion that Jay-Bee likewise breached the LAA.

In support of this conclusion, the business court cited *Triple 7 Commodities, Inc. v. High Country Mining, Inc*., 245 W. Va. 63, 74, 857 S.E.2d 403, 414 (2021) and its dicta explaining that "material breaches . . . permit a nonbreaching party to escape its subsequent performance requirements." This statement of law loosely tracks the instructions given to the jury in regard to material breach. In particular, the jury was instructed that "[a] party that breaches a contract in a material way is barred from recovering" and that "a party is excused from performing the agreement when the other party has already breached the contract." Jay-Bee contends that these are correct statements of law to which Blackrock did not object. Blackrock responds that although they are correct statements of law, they are subject to defenses specifically advanced by Blackrock—and on which the jury was instructed—that may afford it relief despite its first material breach. We agree.

22

Although the statement that a material breach excuses performance is generally correct, it is incomplete. As observed by the business court, this Court has indeed recognized that "[w]hen the performance of one party to a contract is due before that of the other party, an uncured failure of performance by the former discharges the latter's duty of performance only if the failure is material." *Triple 7*, 245 W. Va. at 67, 857 S.E.2d at 407 Syl. Pt. 4, in part. However, in *Triple 7* we specifically further discussed the well-recognized principle that first material breach may be waived by continued performance:

> It is well-established that "[i]f the [nonbreaching] party elects to continue with the contract, it cannot later suspend performance and then claim that it had no duty to perform based upon the first material breach. That defense is waived when the party elects to continue performance of the contract." *Maverick Benefit Advisors, LLC v. Bostrom*, 382 P.3d 753, 759 (Wyo. 2016); *see also Atl. Bitulithic Co. v. Town of Edgewood*, 103 W. Va. 137, 143, 137 S.E. 223, 225 (1927) ("There is no breach so long as the injured party elects to treat the contract as continuing.").

245 W. Va. at 78, 857 S.E.2d at 418; *accord Toney v. Sandy Ridge Coal & Coke Co.*, 84 W. Va. 35, 38-39, 99 S.E. 178, 179 (1919) ("Such breaches of the contract as they may have committed before June 27, 1916, if any, were waived, in so far as they constituted ground for refusal of further performance on the part of the defendant, by the modification of the contract made on that date[] . . . [which] necessarily implied an agreement to continue performance of the contract[.]"). As further summarized by a leading treatise and discussed in *Triple 7*:

> "[T]he general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to perform does not apply when the latter party, with

23

> knowledge of the facts, either performs or indicates a willingness to do so, despite the breach, or insists that the defaulting party continue to render future performance."

245 W. Va. at 78, 857 S.E.2d at 418 (quoting Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 43:15 ("WILLISTON ON CONTRACTS") (4th ed. 2013) (footnotes omitted)); *see also* 23 WILLISTON ON CONTRACTS § 63:9 ("Thus, the general rule is that a contracting party who, with knowledge of a breach by the other party, receives and accepts payment or other performance of the contract will be held to have waived the breach." (footnote omitted)); 17A Am. Jur. 2d *Contracts* § 523 (2024) ("A party cannot elect to continue with the contract, continue to receive benefits from it, and thereafter bring an action for rescission or total breach." (footnote omitted)); *C&C Rd. Constr., Inc. v. SAAB Site Contractors, L.P*., 574 S.W.3d 576, 585 (Tex. App. 2019) ("If the non-breaching party treats the contract as continuing and demands performance from the breaching party, then the non-breaching party must fully perform as well, because the contract continues in force for the benefit of both parties."). In fact, the Texas Court of Appeals referred to these principles as "well-known and unremarkable." *Gulshan Enterprises, Inc. v. Zafar, Inc*., 530 S.W.3d 298, 304 (Tex. App. 2017).

While it was unnecessary to our resolution of the issues in *Triple 7* to issue a new statement of law in this regard, it is well-established that a first material breach may be waived by the non-breaching party's continued performance of its contractual duties and obligations or its insistence that the breaching party continue to perform its respective contractual duties and obligations. We therefore now hold that the general rule that a

24

breaching party's uncured, material failure of performance discharges the other party's duty to perform does not apply when the non-breaching party, with knowledge of the facts, either performs or indicates a willingness to do so despite the breach or insists that the breaching party continue to render future performance. Therefore, the business court's conclusion that Blackrock's first material breach rendered any conduct thereafter "immaterial" was erroneous.

The Illinois Supreme Court recently considered the same error. In *PML Development LLC v. Village of Hawthorn Woods*, 226 N.E.3d 1163 (Ill. 2023), parties to a development agreement—PML and Village—asserted competing breaches of the agreement. The trial court found that both parties materially breached the agreement, but "concluded the Village's first material breach excused PML from performing its obligations under the Agreement" and entered judgment for PML. *Id.* at 1166. The appellate court reversed, finding that neither party could recover damages because each party materially breached the agreement. *Id.*

The Illinois Supreme Court reversed the appellate court, acknowledging that "[t]he first-to-breach rule excuses a party's duty to perform under the contract if the other party materially breaches the agreement first." *Id.* at 1175. However, the court found that the trial court erred when it "ended its analysis here" because "there is an exception to this rule where the nonbreaching party may lose its right to assert the first-to-breach rule if it accepts the benefits of the contract despite the other party's material breach." *Id.* The *PML*

court found that "[b]y continuing the contract, the injured party remains bound by its obligation to perform[] . . . . [and] the injured party may too be liable if it breaches the contract." *Id*.

We find that the business court's construction of the first material breach doctrine is at odds with not only our caselaw and well-recognized principles of contract law, but with its own instructions and special interrogatories. Despite concluding that Blackrock's first material breach rendered the parties' subsequent conduct immaterial, the business court instructed the jury on a variety of defenses that would serve to reinstitute or maintain the parties' contractual obligations, including waiver, as discussed above, as well as ratification and reaffirmation.[19] If any performance-excusing conduct by Blackrock could not have been waived or the contract otherwise "resurrected" to reestablish the parties' contractual obligations, there was no reason to instruct on those defenses. Further, the special interrogatories separately asked, as to each party, whether it breached the LAA; the interrogatories then inquired which party breached first and when. If all that was germane was *which* party breached first, there was no reason to inquire if the other party breached at all.

---

[19] Although not particularly argued by Blackrock in this appeal, the business court also advised the jury on the concept of "novation," instructing that the parties may reach a mutual agreement to "discharge [] a valid existing obligation by the substitution of a new valid obligation."

Therefore, we find that the business court erred in determining that Blackrock's commission of the first material breach necessarily foreclosed its recovery for subsequent breaches by Jay-Bee. *See S. Pipe Coating, Inc. v. Spear & Wood Mfg. Co.*, 363 S.W.2d 912, 913 (Ark. 1963) ("[O]ne side may waive a breach of the contract by the other side and then be liable for its own subsequent breach of the contract."); 17A Am. Jur. 2d *Contracts* § 682 ("Thus, a party may waive a breach by the other party and then be liable for its own subsequent breach."); *cf. Benson v. AJR, Inc.*, 226 W. Va. 165, 177, 698 S.E.2d 638, 650 (2010) (finding that "the jury's finding of [employee's] material breach does not automatically relieve [employer] of its obligation to pay damages").

## B. SPECIAL VERDICT

With the business court's misapprehension of the first material breach doctrine as backdrop, we turn now to Blackrock's arguments regarding its handling of the special verdict. Blackrock argues that the court erred in refusing to include a special interrogatory on defenses which would have allowed the jury to express a finding that the parties continued to perform under the LAA following any breach or termination of the LAA. Specifically, Blackrock argues that the business court should have submitted interrogatories regarding the defenses of waiver, ratification, and reaffirmation [20] or

---

[20] We pause to acknowledge the parties' collective and interchangeable references to these independent, but related, concepts. As discussed above, "[b]reaches of contract can generally be waived by the injured party[] . . . . by continuing performance, demanding or urging further performance, or permitting the other party to perform and accepting or retaining benefits under the contract, may constitute a waiver of a breach." 17B C.J.S. (continued . . .)

otherwise adopted its requested alterations to the special interrogatories which would have allowed the jury to employ those defenses in its findings. Alternatively, Blackrock argues that the business court erred in failing to find the jury's acceptance of one or more of those defenses "necessarily flowed" from its verdict. Jay-Bee counters, consistent with the business court's ruling on this issue, that Blackrock failed to request the waiver/ratification/reaffirmation issue be placed on the special verdict form with sufficient precision. Jay-Bee further maintains that, by virtue of having been instructed on those defenses, the jury was free to consider them in its deliberations.

1. *REQUEST TO INCLUDE WAIVER/RATIFICATION/REAFFIRMATION ON VERDICT FORM*

---

*Contracts* § 748 (2024) (footnotes omitted). Similarly, "[r]atification is an equitable defense that precludes a party 'who [has] accept[ed] the benefits of a transaction from thereafter attacking it.'" *Genger v. TR Invs., LLC*, 26 A.3d 180, 195 (Del. 2011) (footnotes and citations omitted). Succinctly stated, ratification "extinguish[es] the power of avoidance" of a voidable contract. RESTATEMENT (SECOND) OF CONT. § 7 (1981). In that same vein, the RESTATEMENT provides that, "[a] party who has the power of avoidance may lose it by action that manifests a willingness to go on with the contract. Such action is known as '*affirmance*' and has the effect of *ratifying* the contract." *Id.* § 380 cmt. a (emphasis added). The specific term "reaffirmation" however is most typically associated with debtors' reaffirmation of discharged obligations in bankruptcy, notwithstanding the business court's generalized description of the concept in the jury instructions.

By adopting the parties' collective reference to these concepts for convenience, we take no position on their legal sufficiency or applicability to the facts in this case and utilize them only as necessary to express Blackrock's assertion of continued performance as maintaining or creating continued contractual obligations between the parties which were then susceptible to additional breaches.

Blackrock first argues that the business court misapplied Rule 49(a) by refusing, over its objection, to submit for the jury's consideration whether its first breach was waived, or the contract otherwise ratified or reaffirmed, by continuing performance. Blackrock contends this is an issue raised by the pleadings and supported by the evidence, requiring the jury's resolution. Jay-Bee contends Blackrock failed to sufficiently articulate a request for inclusion of those defenses and that, in any event, the issues were effectively submitted "by instruction[.]"

To be sure, the discussion surrounding the special interrogatories during the charge conference was convoluted, and we agree that Blackrock never explicitly asked for inclusion of an interrogatory about whether Jay-Bee had waived or ratified/reaffirmed the contract through continued performance following any alleged material breach. Nevertheless, the specter of these defenses plainly predominated the discussion about the phrasing of the special interrogatories.[21]

---

[21] Complicating the issue is that counsel and the court appear to have been referring to waiver and/or ratification/reaffirmation through continued performance subsequent to the February 2015 *notice of termination* rather than subsequent to any material breach. Jay-Bee argued that the February 2015 attempted termination of the LAA was effective; Blackrock sought to counter that potential finding by urging the jury to find the contract "resurrected" following that termination by operation of one of these defenses. We find that regardless of whether the parties were focused on waiver/ratification/reaffirmation as pertained to the attempted termination in February or any material breach, these concepts were argued as having the same effect: maintaining, reviving, or creating contractual obligations between the parties which were then susceptible to additional breaches by either party.

In discussing the special interrogatory regarding whether Jay-Bee provided reasonable notice of termination of the LAA, Blackrock's counsel stated:

> If we're going to do it this way . . . I think we need to put, Did they waive then? . . . Right, *there's no place for the waiver of the notice [of termination] in this verdict form.* Are you wanting them to remember that? I mean, what is your reasoning on that?

(Emphasis added). The court then referenced a potential finding that "[Jay-Bee] withdrew their notice [of termination] by conduct" and inquired of Jay-Bee's counsel *"[i]f waiver is going to be a thing, Mr. Bracken, how do we ascertain that*?" (Emphasis added). Blackrock's counsel then suggested that the reasonable notice interrogatory be modified to include the phrase "[i]f said termination wasn't subsequently waived" and the court added "[o]r ratified" to his suggestion, which was reformulated to " . . . and did not *waive or ratify continued performance* of the same." (Emphasis added).

Conceding that it was "a problem that we need to deal with," the court then encapsulated the issue by wondering aloud: "[I]f a party terminates the agreement and then *continues to behave as if it was not terminated*, *continued* the type [of] benefit, *continued* to acquire acreage. . . . What do you do when you have at least two strikingly inconsistent acts with a terminated agreement?" (Emphasis added). Blackrock's counsel added, "Judge, legally our position is they can Lazarus the agreement, they can raise it from the dead, and they did, even if it were dead." Blackrock's counsel then specifically requested that the notice of termination interrogatory be revised to include the phrase "not subsequently contradicted by words and conduct"; the business court refused and stated

30

that Blackrock's objection was overruled. We therefore disagree with the business court's conclusion that Blackrock failed to sufficiently request that the jury be presented with an opportunity to consider whether continued performance served to effect a waiver of any breach or otherwise maintain or resurrect the parties' obligations—through one of the concepts of waiver, ratification, or reaffirmation on which it was instructed.

## 2. *OMISSION OF ISSUES FROM THE SPECIAL VERDICT*

More importantly for purposes of Rule 49(a), however, we find that the pleadings and evidence clearly evince Blackrock's reliance on these defenses and were therefore material issues necessary to a fair resolution of the case. *Cf. Combs v. Hahn*, 205 W. Va. 102, 107, 516 S.E.2d 506, 511 (1999) (contrasting sufficiency of objection to "a verdict that is defective in form and a verdict that is defective in substance"). Rule 49(a) provides that the court may employ special verdict findings on "each issue of fact" as "might properly be made under the pleadings and evidence[.]" Similarly, to ensure the holistic adequacy of the findings, the rule provides for additional fact-finding measures for the "omi[ssion] [of] any issue of fact raised by the pleadings or by the evidence[.]" *Id*.

Generally, in reviewing the adequacy of a verdict form we have held that the determinative factor is "whether the verdict form, together with any instruction relating to it, allows the jury to render a verdict on the issues framed consistent with the law, with the evidence, and with the jury's own convictions." *Adkins v. Foster*, 195 W. Va. 566, 572, 466 S.E.2d 417, 423 (1995). We have further counseled that "interrogatories should be

31

used cautiously and only to clarify rather than to obfuscate the issues involved." *Carper v. Kanawha Banking & Tr. Co.*, 157 W. Va. 477, 513, 207 S.E.2d 897, 919 (1974).

And while we have little caselaw discussing the use and operation of Rule 49(a) specifically, we have nonetheless captured its most fundamental requirement: "'The court has considerable discretion about the nature and scope of the issues to be submitted to the jury under Rule 49(a) *so long as they present the case fairly*. *All material factual issues* should be covered by the questions submitted.'" *Teter*, 190 W. Va. at 720, 441 S.E.2d at 737 (quoting 9B Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civil* § 2506 (3d ed.)) (emphasis added). Federal courts interpreting their similarly worded Rule 49 have issued the same caveat.[22] *See U. S. v. Real Prop. Located at 20832 Big Rock Drive, Malibu, Cal. 902655*, 51 F.3d 1402, 1408 (9th Cir. 1995) (trial court's broad discretion under Rule 49 "extends to determining the content and layout of the verdict form, and any interrogatories submitted to the jury, provided the questions asked are reasonably capable of an interpretation that would allow the jury to address all factual issues essential to judgment[]"); *Stewart & Stevenson Servs., Inc. v. Pickard*, 749 F.2d 635, 643 (11th Cir. 1984) ("The trial court also has discretion over the nature and scope of the issues submitted to the jury. This discretion is limited, however, by the rule that the trial court 'must submit all material issues raised by the pleadings and the evidence.'" (citations omitted)); *see also* Wright & Miller *supra* § 2506 ("It is essential that all material factual issues in the case

---

[22] *See supra* n.14 (regarding amendment to Rule 49 to comport with federal rule).

should be covered by the questions submitted to enable the trial judge to enter a judgment on the entire dispute on the basis of the jury's responses.").

In determining whether material issues have been omitted from a special verdict such as to trigger the fact-finding aspect of the rule, we find considerations articulated by the Supreme Court of Montana instructive. In *Estate of Frazier v. Miller*, 484 P.3d 912, 922 (Mont. 2021), the court held that in examining the adequacy of a special verdict a court should evaluate:

> 1) whether, when read as a whole and in conjunction with the general charge, the interrogatories adequately presented the contested issues to the jury; 2) whether the submission of the issues to the jury was fair; and 3) whether the ultimate questions of fact were clearly submitted to the jury.

(quoting *Baldauf v. Arrow Tank & Eng'g Co.*, 979 P.2d 166 (Mont. 1999)); *accord Tights, Inc. v. Acme-McCrary Corp.*, 541 F.2d 1047, 1060 (4th Cir. 1976) (articulating same factors for examining special verdict); *see also Capers v. Bon Marche, Div. of Allied Stores*, 955 P.2d 822, 825 (Wash. Ct. App. 1998) ("Essentially, when read as a whole and with the general charge, the special verdict must adequately present the contested issues to the jury in an unclouded, fair manner."). Although tempting to read these enumerated items as duplicative considerations striking generally at "fairness," each element implicates a different concern. The first element requires that the charge, instructions, and questions submitted to the jury be considered both individually and in the aggregate to ensure that the contested issues are encapsulated properly and consistently. The second element considers whether the manner of submission of the issues was fair: that is, whether issues

33

were submitted in a manner capable of misleading the jury or producing an issue-biased result. The final element seeks to ensure that the jury is given an opportunity to clearly express its findings on determinative issues such as to allow the court to enter a proper judgment upon those findings.

In that regard, we hold that to determine whether a material issue has been unfairly omitted from special findings requested under West Virginia Rule of Civil Procedure 49(a), the court must consider whether 1) when read as a whole and in conjunction with the general charge and instructions, the questions submitted adequately presented the contested issues to the jury; 2) the submission of the issues to the jury was fair; and 3) the ultimate questions of fact were clearly submitted to the jury. As previously held herein, review of the pleadings and evidence to ascertain the material issues and to perform this analysis necessitates our de novo review.

We conclude that findings regarding waiver of breach, as well ratification or reaffirmation of the parties' contractual obligations through continued performance were material issues which were unfairly omitted from the jury's special findings. Blackrock cites ample evidence at trial arguably demonstrating years of continuing performance or other conduct following its February 2014 "first breach" from which the jury could have found waiver of that breach or Jay-Bee's reaffirmation or ratification of the contract as outlined above. And while Jay-Bee insists that these facts were contested, we are required to construe the evidence in the light most favorable to Blackrock. *See Fredeking*, 224 W.

34

Va. at 1, 680 S.E.2d at 17, Syl. Pt. 1, in part. Not only did the pleadings and evidence reflect that these defenses were central to Blackrock's case, but the court specifically instructed on them, and counsel argued their application during closing argument. Despite being paramount to resolution of the case, the jury was not provided a meaningful way to express a finding on these issues, other than by implication.[23] And, as the following discussion reveals, we believe that it did.

### 3. FACTUAL FINDINGS ON OMITTED ISSUE

Having concluded that material issues were unfairly omitted, we turn now to the fact-finding aspect of Rule 49(a). This issue dovetails with Blackrock's argument that—notwithstanding the absence of special interrogatories on these issues—the jury's responses implicitly demonstrate that it found Blackrock's first material breach waived or the parties' contractual obligations ratified or reaffirmed. Jay-Bee counters that, by

---

[23] For this reason, merely instructing the jury on these defenses was inadequate to afford Blackrock the benefit of them as the jury had no way to *clearly* express a finding on them. *See Stewart & Stevenson Servs.*, 749 F.2d at 643 ("Even assuming that the district court's charge adequately instructed the jury on these elements, the 'fact remains that nothing in the interrogatories would have allowed the jury to find [for the defendant on these grounds].'"). This scenario stands in contrast to the verdict form at issue in *Perrine*, which Jay-Bee contends is similar. *See* 225 W. Va. at 482, 694 S.E.2d at 815. First, we note that there is no indication in *Perrine* that the verdict at issue was a Rule 49(a) special verdict. Second, the verdict form in *Perrine* was challenged for failing to specifically inquire about the existence of one of five factors to be considered in determining whether plaintiffs proved one of the elements of their cause of action. 225 W. Va. at 539, 694 S.E.2d at 872. There is a considerable distinction between whether a party is entitled to have a singular factor or element contained in the jury instructions isolated on a general verdict form by way of interrogatory and whether a Rule 49(a) special verdict form fails to enable the jury to express a finding on a defense which has significant legal consequences affecting the application of the law to the special findings.

operation of Rule 49(a), the business court is deemed to have made a finding on these defenses consistent with its judgment for Jay-Bee, i.e., that Blackrock's breach was neither waived nor the contract ratified or reaffirmed, and that Blackrock failed to challenge these "deemed" findings on appeal.

As previously discussed, as a consequence of divorcing the infinite number of factual assessments a jury makes during deliberations from its ultimate verdict for or against a party, the rule expressly contemplates the possibility that material factual issues may have been omitted and provides a procedure for handling those issues.[24] If an omission occurs, a party waives its right to a jury trial on any such issue unless it demands the issue be submitted before the jury retires. *See* W. Va. R. Civ. P. 49(a). It is undisputed that Blackrock made no such request.[25]

---

[24] In fact, the wisdom of allowing for additional fact-finding in the case of special verdicts is well-demonstrated in the instant case. Rule 49(a) permits the presentation of more than mere affirmative or negative responses which ordinarily serve to steer the jury's deliberations to a degree; instead, the rule permits the jury to provide "categorical or other brief answer[s]," allowing the jury to respond to a special finding in a manner perhaps not anticipated by the parties or the court in constructing the verdict form. In the instant case, following the reading of the jury's special verdict finding that Blackrock's first material breach occurred on February 4, 2014, Blackrock's counsel requested a copy of the verdict form to enable him to "go figure out what happened on that date" inasmuch as Jay-Bee had not specifically argued that Blackrock's first breach occurred on that date.

[25] Therefore, the process and submission of omitted issues to the jury "before it retires" and any related topics are outside of the scope of this opinion.

However, recognizing the necessity of findings on material issues to enable the court to enter a proper judgment, the rule provides for gap-filling on omitted issues in one of two ways, even if a party fails to demand their submission: 1) the court may engage in fact-finding on the omitted issue(s); or 2) if it declines to do so, it is "deemed" to have made findings consistent with the judgment entered. "As to an issue omitted without such demand the court *may* make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict." *Id.* (emphasis added); *see McDaniel v. Anheuser-Busch, Inc.*, 987 F.2d 298, 306 (5th Cir. 1993) ("[B]y requesting the submission of a special issue, a party prevents an adverse Rule 49(a) 'deemed finding' by the court in the event that the requested issue is refused."); *Kinnel v. Mid-Atl. Mausoleums, Inc.*, 850 F.2d 958, 965 (3d Cir. 1988) ("Rule 49(a) . . . was designed to have the court supply an omitted subsidiary finding which would complete the jury's determination or verdict."). When a court fails or refuses to make findings on omitted material issues, the "deemed finding" aspect of Rule 49(a) has been aptly described by one federal court as "self-executing." *See Reo Indus., Inc. v. Pangaea Res. Corp.*, 800 F.2d 498, 499 (5th Cir. 1986) ("[B]ecause Rule 49(a) is a self-executing rule, the trial court is deemed to have made a finding on the issue in accordance with the judgment rendered on the special verdict.").

Therefore, contrary to Blackrock's position, it was not per se error for the business court to refuse to make a finding on waiver or any potential ratification or reaffirmation; the court is simply deemed to have made those findings consistent with the

37

judgment it ultimately entered. Here, the business court entered judgment for Jay-Bee, thus finding by necessary implication that Jay-Bee neither waived Blackrock's breach nor ratified or reaffirmed the contract such as to permit Blackrock to recover for any subsequent breach by Jay-Bee. Contrary to Jay-Bee's position that Blackrock failed to adequately challenge this finding, we conclude that this "deemed finding" falls squarely within Blackrock's assignments of error; as per our newly enunciated standard of review, we examine that finding for clear error.

Review of the business court's "deemed findings" leads inexorably to Blackrock's contention that the jury implicitly found that Jay-Bee waived Blackrock's first breach and that the court's entry of judgment for Jay-Bee was therefore inconsistent with the verdict. Blackrock tethers this inference of waiver to the jury's determination that Jay-Bee did not give reasonable notice of termination of the LAA until December 2017—more than three years after the first breach. In this regard, Blackrock reasons that the jury *must* have found waiver/ratification/reaffirmation based on evidence of the parties' continued performance, otherwise the contract would not have still been "alive" to terminate in 2017. The business court found this argument unavailing, reasoning that Jay-Bee's failure to provide reasonable notice of termination until some years later does not necessarily mean that the jury found that the parties continued to perform under the LAA in the interim, citing *Blue v. Hazel-Atlas Glass Co.*, 106 W. Va. 642, 650, 147 S.E. 22, 26 (1929) ("The mere fact that one party to the contract does not terminate it on a breach by the other party of its provisions does not establish a waiver.").

38

Based upon our review of the instructions and special interrogatories, we agree with Blackrock that the jury's verdict reflects its acceptance of one of its defenses—whether waiver, ratification, or reaffirmation—such as to maintain or resurrect the parties' contractual obligations. We also agree that the finding that notice of termination was not given until December 2017 lends theoretical support for the idea that the jury also found that the LAA continued in effect until that time. However, that conclusion is somewhat speculative; as the business court noted, our caselaw indicates that failure to promptly provide notice of termination does not necessarily constitute a waiver. In theory, the jury could have concluded that any ongoing interaction between the parties was not necessarily evidence of "continued performance" until its December 2017 notice of termination.

Instead of that speculative conclusion, we believe that a finding of waiver/ratification/reaffirmation is implicit in the jury's special verdict based upon the instructions it received. In its instruction on materiality the court instructed the jury it must determine which party materially breached first and further stated: "The significance of finding which party materially breached the contract first is that *a party is excused from performing the agreement when the other party has already breached the contract.*" (Emphasis added). The jury found that Blackrock breached *first* and this instruction advised that this had the effect of excusing Jay-Bee's continued performance. Therefore, under the business court's instructions, the only way for the jury to find that Jay-Bee

39

subsequently[26] breached is by finding that it waived Blackrock's first breach or otherwise thereafter ratified or reaffirmed the contract. *See* Wright & Miller *supra* § 2510 (observing that in analyzing special verdicts "the answers to the questions are to be construed in the context of the surrounding circumstances of the case and *in connection with the pleadings, instructions, and issues submitted.*" (emphasis added)); *see also Anderson*, 862 F.2d at 919 (affirming trial court's Rule 49(a) finding on an issue "which was omitted from, but likely implicit in, the verdict[]").

Simply stated, a party cannot breach a contract under which its performance has been excused, yet the jury found that Jay-Bee subsequently breached—a finding to which the business court afforded no significance or legal effect. "[U]nder Rule 49(a), the trial court simply cannot choose to ignore a legitimate finding that is part of the special verdict." *Floyd v. Laws*, 929 F.2d 1390, 1397 (9th Cir. 1991); *see also* 75B Am. Jur. 2d *Trial* § 1506 ("[T]he judgment [entered upon special verdict] must be the logical, legal conclusion from the facts found by the jury[.]"). As previously discussed, this was precipitated by the business court's erroneous conclusion that any subsequent breach was "immaterial" under the first breach doctrine. Therefore, the court's "deemed finding" that

---

[26] In its order denying Blackrock's Rule 50 motion the business court reached the illogical conclusion that the jury was not asked and did not find any "subsequent" breaches. To the contrary, by concluding that both Blackrock and Jay-Bee breached, and that Blackrock's breach was first, any breach by Jay-Bee was necessarily subsequent thereto.

40

Jay-Bee neither waived the first breach nor ratified or reaffirmed the contract ignores one of the jury's special findings and, as a result, is inconsistent with its special verdict.

Federal caselaw makes clear that a trial court's "Rule 49(a) finding cannot be inconsistent with the jury verdict." *Askanase v. Fatjo*, 130 F.3d 657, 670 (5th Cir. 1997). Moreover, no individual finding may be construed inconsistently with another individual finding. *See Gaia Techs. Inc. v. Recycled Prod. Corp.*, 175 F.3d 365, 371 (5th Cir. 1999) ("Rule 49(a) does not authorize the district court to reform the jury's . . . findings" to reach a certain judgment); *Hiltgen v. Sumrall,* 47 F.3d 695, 701 & n.7 (5th Cir. 1995) (concluding court is "constitutionally required under the Seventh Amendment['s] [preservation of right to trial by jury] to adopt a view of the case that makes the jury's answers consistent[]" and noting jury's verdict must be considered "as a whole" rejecting "specific fact findings with regard to a particular special verdict [] if those findings cause a direct conflict with another special verdict[]"); *Boyle v. Harries*, 923 P.2d 504, 510 (Kan. Ct. App. 1996) ("'In considering special findings the court is not permitted to isolate one and ignore others, but all are to be considered together, and if one interpretation leads to inconsistency and another to harmony with the verdict, the latter is to be adopted.'" (quoting *Knape v. Livingston Oil Co.*, 392 P.2d 842, 844 (Kan. 1964)); *Hancock v. Sammons*, 267 S.W.2d 252, 257 (Tex. App. 1954) ("In construing a verdict, every finding is of equal importance in the consideration, and when rightly interpreted, it cannot be varied by the correct interpretation of another finding of equal dignity."). We therefore conclude that the business court's Rule 49(a) "deemed finding" that Jay-Bee neither waived the first breach

41

nor ratified or reaffirmed the contract was clearly erroneous in light of the remainder of the jury's special verdict.

## C.    *APPROPRIATE RELIEF*

Blackrock argued below, and before this Court, that as a result of the jury's implicit finding of waiver/ratification/reaffirmation and Jay-Bee's subsequent breach, it is entitled to judgment as a matter of law. And while we agree that the jury's special verdict reflects acceptance of one of Blackrock's defenses which would have restored or maintained the parties' contractual obligations to each other, thus making possible Jay-Bee's subsequent breach thereof, we are loath to simply accept Blackrock's invitation to enter judgment in its favor.

As demonstrated by the evidence adduced at trial and as argued in this appeal, Jay-Bee asserts "pervasive and continuing" material breaches of the LAA by Blackrock. During closing argument, Jay-Bee argued four different material breaches by Blackrock, as discussed *supra*. Even the business court recognized in its order denying Blackrock's Rule 50 motion that "the jury could have found that there were breaches made by Blackrock on subsequent dates that would have also been material." Because the jury was asked only to find Blackrock's "first" material breach, we do not know what a jury might determine regarding any breaches by Blackrock subsequent to any waiver or ratification/reaffirmation. Moreover, we do not know whether a jury might find additional

waivers of any such additional breach(es) or subsequent ratification/reaffirmation, under

the particular facts of this case.

This scenario is not unique. Commentators have long acknowledged the

"vexing problems arising out of appellate review of special verdict cases" regarding

> whether and under what circumstances a partial retrial is an
> appropriate remedy if the judgment is vitiated . . . by *improper
> direction of verdict on an issue*; and whether and under what
> circumstances an appellate court . . . *should enter judgment on
> the basis of other factual findings, in lieu of having the entire
> case retried because of the possibility of interrelated answers.*

Robert Dudnik, *Special Verdicts: Rule 49 of the Federal Rules of Civil Procedure*, 74 Yale

L.J. 483, 515 (1965) (emphasis added) (footnote omitted). Further, we agree that

> the rule that a failure by a jury to answer some of the questions
> in a special verdict does not vitiate an otherwise unanimous
> verdict where the unanimous answers to the verdict
> conclusively dispose of the case, does not apply when
> questions on the verdict form that are vital to the disposition of
> the case remain unanswered.

75B Am. Jur. 2d *Trial* § 1507 (footnote omitted). Therefore, we conclude that the only

way to adequately remedy the errors presented is with a new trial. *Accord* Syl. Pt. 4,

*Sanders v. Georgia-Pacific Corp.*, 159 W. Va. 621, 225 S.E.2d 218 (1976) (requiring new

trial where "it is clear that the trial court has acted under some misapprehension of the law

or the evidence[]"); *In re State Pub. Bldg. Asbestos Litig.*, 193 W. Va. 119, 124, 454 S.E.2d

43

413, 418 (1994) (requiring new trial where "'prejudicial error has crept into the record or that substantial justice has not been done[]'" (citations omitted)).[27]

Finally, we separately address the effect of our award of a new trial on the business court's determination that the parties were engaged in a mining partnership. Because of our award of a new trial on liability, we need not address the assignments of error surrounding the "phase two" proceedings affording legal and equitable remedies to Jay-Bee that were based—at least in part—on the jury's findings. *See generally* Syl. Pt. 3, *Talkington v. Barnhart*, 164 W. Va. 488, 264 S.E.2d 450 (1980) ("Where a verdict is inadequate as a matter of law, and liability is contested, the cause will be remanded for a new trial on both liability and damages."). However, despite characterizing the mining partnership determination as a "threshold issue[] in the damages trial," at oral argument, Blackrock urged the Court to review the business court's ruling on that issue notwithstanding any potential award of a new trial.

---

[27] We reject Jay-Bee's contention that Blackrock forfeited its right to the remedy of a new trial because it failed to move for a new trial under West Virginia Rule of Civil Procedure 59. Blackrock's dual motion citing Rules 49 and 50 incorporated its special verdict arguments in its request for judgment as a matter of law under Rule 50, arguing that "as a matter of law, the case cannot rise or fall on [Blackrock's breach] . . . because the jury found that Jay-Bee waived, ratified or reaffirmed the LAA" and requesting "any and all further relief . . . available pursuant to Rule 50(b)[.]" That relief, of course, includes a new trial: "In ruling on a renewed motion, the court may: (1) If a verdict was returned: (A) allow the judgment to stand, (B) *order a new trial*, or (C) direct entry of judgment as a matter of law[.]" *Id.* (emphasis added); *see also* W. Va. R. Civ. P. 59(f) ("[I]f a party has made a motion under Rule 50(b) . . . the party's failure to move for a new trial is not a waiver of error in the court's denying or failing to grant [relief under Rule 50(b)].").

Blackrock's request for our review of the mining partnership ruling implicates the severability of certain issues from retrial; that is, whether the Court should treat the mining partnership determination as a severable issue that may stand on its own merits for our review, notwithstanding the necessity of a new trial on liability. Courts have recognized generally that if an issue is "sufficiently distinct and severable from the others" such that exempting it from retrial "would not result in an injustice[,]" it may be proper to order only a partial retrial of issues as necessary. *Valentine v. Baxter Healthcare Corp.*, 81 Cal. Rptr. 2d 252, 260 (Cal. Ct. App. 1999); *accord Talkington*, 164 W. Va. at 495, 264 S.E.2d at 454 (sanctioning severance of retrial issues only where they are "separate and distinct"). Courts have further limited the severance of issues from retrial—as opposed to requiring retrial of the entirety of the case—where it would cause "'confusion and uncertainty[.]'" *Lewis v. City of Benicia*, 169 Cal. Rptr. 3d 794, 813 (Cal. Ct. App. 2014) (citations omitted).

In this case, the business court's ruling on the mining partnership issue relied almost entirely on evidence presented to the jury during the liability phase, thus demonstrating the interwoven nature of the issues. *See supra* n.11. Given that the liability phase is now subject to retrial, the evidence presented on retrial may be reshaped or augmented and may serve to cast a different light on the mining partnership issue. *See Morrison v. Sharma,* 200 W. Va. 192, 196, 488 S.E.2d 467, 471 (1997) (recognizing on retrial parties may not "'present [their] case in the same way or with the same testimony'" and rulings based on that evidence would be "'basically hypothetical[]'" (citations

45

omitted)); 58 Am. Jur. 2d *New Trial* § 398 ("In a new trial, the parties are entitled to introduce additional or new evidence not introduced at the earlier trial, and the parties may present evidence differently." (footnotes omitted)). As a result, we do not find it appropriate to bind the business court and the parties to a ruling which was based upon evidence that may be affected by subsequent proceedings on remand. *See Day v. Amax, Inc.*, 701 F.2d 1258, 1263 (8th Cir. 1983) (finding that although evidence on retrial may be similar, court on retrial is not bound by rulings during prior trial). We therefore decline to address the business court's ruling on the existence of a mining partnership and likewise vacate that aspect of the final judgment order.

## IV. CONCLUSION

For the reasons set forth above, we vacate that portion of the April 25, 2022, final judgment order of the Circuit Court of Pleasants County, Business Court Division, regarding the existence of a mining partnership. As to the remainder of the April 25, 2022, final judgment order, we reverse and remand for further proceedings consistent with this opinion.

Reversed and remanded, in part; vacated, in part.